# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ATTORNEYS FOR PLAINTIFF:
Edward E. Kopko, Esq.
NDNY Bar Roll No. 510874
Edward E. Kopko,, Lawyer, P.C.
308 North Tioga St., Second Floor
Ithaca, New York 14850
607.269.1300; 607.269.1301 fax
ekopko@ithaca.law

John A. Fitzgerald, Esq.
NDNY Bar Roll No. 303022
308 N. Tioga St., Ithaca, New York 14850
T: 607.269.7125; jfitzgerald@ithaca.law

KYLE GOLDSTEIN,

                    Plaintiff,

vs.

JACOB V. ALLARD, DANIEL A. BECHTOLD, JOHN BARBER, and CITY OF ITHACA,

                    Defendants.

Docket No.  3:19-cv-412 (DNH/DEP)

**Jury Trial Demanded**

---

# COMPLAINT

Plaintiff, Kyle Goldstein, by and through his attorneys, Edward E. Kopko, Lawyer, P.C., complains against Defendants and requests trial by jury as follows:

## INTRODUCTION

1.  This is an action brought by Kyle Goldstein, a college student, for deprivations of his constitutional rights caused by illegal police conduct and police brutality.

2.  On November 17, 2016, Goldstein, then 21 years old, five feet eight inches tall, and weighing approximately 135 pounds was illegally detained by police during a party at his rented home on 702 Hudson Street, Ithaca, New York.

3.  During the course of this illegal detention Goldstein was arrested illegally.

4.   During the course of this illegal detention and arrest Goldstein was senselessly sprayed with pepper spray directly into his eyes from mere inches away, causing injuries to his eyes, and serious and permanent damage to his right eye in particular by Ithaca City Police Officer Jacob V. Allard.

5.   The entire episode was captured by police body cams and irrefutably demonstrates that Goldstein posed no threat to Allard who is at least six feet tall and weighs over 200 pounds.

6.   The video demonstrates Goldstein was sprayed directly in his eye at a time when Goldstein was handcuffed behind his back and lying prostrate on his living room floor and posed no threat, was not resisting arrest, or trying to flee.

7.   This picture shows the injury to Goldstein's eye:



8.  In concert or conspiracy, Defendants then maliciously and baselessly caused Goldstein to be prosecuted with the charge of Obstruction of Governmental Administration and Resisting Arrest, charges that were subsequently dismissed by the Tompkins County District Attorney.

## JURISDICTION

9.  Goldstein's claims against Defendants are predicated upon 42 U.S.C. § 1983, relating to deprivation of rights.   This Court has jurisdiction of this § 1983 claim. *Maine v. Thiboutot*, 448 U.S. 1 (1980); *Martinez v. California*, 444 U.S. 277 (1980).

## VENUE

10. All of the acts complained of in this complaint occurred in Tompkins County.

## IDENTITY OF THE PARTIES

11. At all relevant times, Goldstein is a citizen of the United States and a resident of the State of New York, and County of Tompkins.

12. At all relevant times, Defendant Jacob V. Allard was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as a law enforcement officer employed by the Defendant City of Ithaca, and/or the Ithaca Police Department.

13. At all relevant times Allard was acting in the course and general scope of his employment by Ithaca City Police Department pursuant to the authority given to him by the City of Ithaca and pursuant to its instructions and duty assignments.

14. By virtue of Allard's appointment and employment as a police officer with the Ithaca City Police Department, Allard is a "police officer" as that term is defined in CPL § 1.20(34) (d).

15. As a police officer, Allard, when seizing, arresting and acting with excessive force against Goldstein, acted under color of law by using the authority vested in him by virtue of his appointment and by using the arrest procedures, appearance ticket procedures, and preliminary arraignment procedures set forth in CPL § 150.20, which procedures are only available to police officers.

16. Allard is sued in his individual capacity.

17. At all times relevant, Defendant Daniel A. Bechtold ("Bechtold") was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as a law enforcement officer employed by the Defendant City and/or of the Ithaca City Police Department.

18. At all relevant times Bechtold was acting in the course and general scope of his employment by Ithaca City Police Department pursuant to the authority given to him by the City of Ithaca and pursuant to its instructions and duty assignments.

19. By virtue of Bechtold's appointment and employment as a police officer with the Ithaca City Police Department, Bechtold is a "police officer" as that term is defined in CPL § 1.20(34) (d).

20. As a police officer, Bechtold, when seizing, arresting and acting with excessive force against Goldstein, acted under color of law by using the authority vested in him by virtue of his appointment and by using the arrest procedures, appearance ticket

procedures, and preliminary arraignment procedures set forth in CPL § 150.20, which procedures are only available to police officers.

21. Defendant Bechtold is sued individually.

22. Defendant City of Ithaca ("City") is a New York municipal corporation and is the legal entity responsible for itself and for the Ithaca Police Department.  The City is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

23. At all relevant times, Defendant John Barber ("Barber") was a citizen of the United States and a resident of the State of New York.  Barber is sued in his official capacity as the Chief of Police of the Ithaca City Police Department during the relevant period of time, employed by the City and/or the Ithaca City Police Department, and was acting under color of state law.

24. As Chief of the Ithaca Police Department, Barber trained and supervised Defendants Allard and Bechtold.

25. Defendant City and Barber are properly sued directly under 42 U.S.C. § 1983 for their own and their delegated deliberately indifferent unconstitutional decisions, policies, practices, habits, customs, usages, training and derelict supervision, ratification, acquiescence and intentional failures which were moving forces in the complained of constitutional violations and resulting injuries.

26. The Defendant City is also properly sued under 42 U.S.C. § 1983 for the challenged delegated final decision of Barber in his official capacity as the Chief of the Ithaca City Police Department, and for those of any final delegated decision makers, with respect to the challenged deliberately indifferent policies, decisions, widespread habits, customs, usages, and practices.

## STATEMENT OF FACTS

27. On November 17, 2016, at approximately 11:30 p.m., Allard was dispatched to 702 Hudson Street, in the City of Ithaca ("the residence"), for a noise complaint.

28. Allard recorded the entire incident on his body camera.

29. The recording was delivered by the prosecutor in connection with discovery in the underlying criminal case against Goldstein on a CD.  The particular file containing the footage is labeled "AXON_Body_Video_2016-11-17_2333."  **Exhibit 1.**[1]

**ALLARD BODY CAM VIDEO**

30. Allard parked his cruiser and approached the residence on foot.

31. Upon information and belief, Bechtold is following Allard on foot.

32. Voices can be heard in the background as Allard approaches the residence, but the volume of the voices is not unreasonable, and there is no loud music being played.

33. As Allard approaches the driveway of the residence, four young women are seen walking away from the residence.

---

[1] The DVD containing the footage of Defendant Allard's body cam was sent to the Clerk of the United States District Court for the Northern District of New York for filing.

34. Allard says "Have a good night, ladies," and one of the women respond "You too, thank you."

35. Allard approaches a set of stairs leading to a door that enters into the residence.

36. A young woman is standing at the base of the stairs.

37. Allard says "Hello" to the woman, and she responds "Hello." Allard says "Have a safe night" and she responds "Thank you."

38. As Allard approaches the base of the stairs a couple of people are descending the stairs.

39. Allard says "Have a safe night guys," and one of them responds "You too."

40. Another woman descends the stairs and Allard says again "Have a safe night," and the woman responds "You too."

41. Upon information and belief, Bechtold can be heard in the background wishing the party goers a safe night as well.

42. One of the party goers tells Allard "I like your hat," and Allard responds "Thank you."

**ILLEGAL ENTRY**

43. Allard climbs the stairs leading to the entrance to the residence.

44. The door at the top of the stairs is open.

45. Several other people are seen leaving and again Allard wishes them "a safe night."

46. Allard arrives at the front door and a young woman is seen standing there.

47. Allard says "Okay guys, who lives here?", but the young woman just looks at her cell phone then responds, upon information and belief saying, "I don't know."

48. Allard enters the residence and starts yelling "Let's go, everybody out," and gestures with his thumb towards the door.

49. Allard starts waving his flashlight back and forth presumably to get attention, and continues to yell "Everybody out, let's go."

50. People are seen starting to leave.

51. Officer Bechtold is seen, also standing inside the residence, with a flashlight in his hand.

52. Many people continue to leave.

53. Allard continues wishing the departing party goers to "have a safe night."

54. Allard moves farther into the residence and yells "Alright, let's go, everybody out, let's go."  At this point Kyle Goldstein is seen standing with another man.  The other man, unidentified, is looking at Allard and gesturing as if to inquire what the officers want.  Both this man and Goldstein are acting peacefully.

55. More people start to leave and Allard continues yelling "Out.  Party's over."

56. Bechtold is seen moving farther into the residence and reaching for Goldstein and shaking his head.

57. People continue to leave and Allard says again "Have a safe night, guys." Someone responds "You too," and Allard says "Thank you."

**ILLEGAL DETENTION**

58. The people leaving momentarily obscure Bechtold and Goldstein, but when they come back into view Bechtold appears to be holding Goldstein's right arm with his left hand and is gesturing for Goldstein to stand against a wall.

59. Goldstein complies peacefully.  He is not resisting arrest, trying to leave, being otherwise uncooperative, or even speaking to Bechtold.

60. People continue to leave.  Goldstein, with Bechtold standing to his right, is watching people leave, then turns to his left apparently to respond to someone speaking to him.

61. Bechtold looks at Allard and points to Goldstein presumably to indicate to Allard Goldstein is a resident of the residence.

62. Goldstein continues to speak with someone to his left, and he moves toward the person with whom he is speaking.

63. Bechtold is heard yelling "Whoa, whoa…" and it appears, although both Bechtold and Goldstein are obscured by the departing party goers, that Bechtold forcefully pulls Goldstein back toward him.

64. Bechtold is seen speaking to Goldstein, holding Goldstein's right arm, and pointing at Goldstein's face with his flashlight, then gesturing in an up and down motion with the flashlight ordering Goldstein to remain standing where he is.

65. Goldstein is seen speaking with Bechtold and, at one point, Goldstein raises his right arm while Bechtold is still holding it, but otherwise makes no motion to flee.

**ILLEGAL ARREST**

66. Allard moves toward Goldstein, grabs Goldstein's left arm, twisting it around behind him, and tells Goldstein to "put your hands behind your back," and Goldstein is handcuffed and pushed face first against the wall.

67. Bechtold holds Goldstein's right arm behind his back and is seen talking to another male wearing a white hat over his right shoulder.

68. Allard is heard saying "Get these people out of here now.  Get 'em going.  Talk to them.  Get them out."  Allard is seen pointing at a group of people in the residence.  It is unclear if Allard is speaking to Goldstein or a male wearing a white baseball hat at this point.

69. In any event, Goldstein responds saying "if you [inaudible], I'd be happy to do so."

70. Allard is heard requesting more units come to the residence.

71. Some people continue to leave, but a crowd of people, approximately 30 in number, is seen still standing in what appears to be the residence's living room, some are watching the officers, but none seem too concerned.

72. No one is acting unruly, shouting, or exhibiting any aggressive behavior, and no one is out of control.

73. Allard shines and waves his flashlight in the direction of the crowd and yells "Hey, let's go, let's go."

74. Bechtold is seen moving toward the crowd.

75. Allard is standing with Goldstein to his left.

76. Goldstein and Allard have a conversation but the audio is unclear.

77. The din of the surrounding noise makes it very difficult to hear what is being said and by whom exactly.

78. At some point it appears a young woman is seen moving close to Goldstein and speaking to Allard. It is unclear what she says. This young woman is later identified as Julia Judge ("Judge").

79. It appears she is then restrained by one of the officers, but the actual incident is just off camera.

80. Goldstein starts to yell "Madison" at another young woman, and, upon information and belief, it appears he is asking her to get a video camera.

81. The young woman, Madison, moves into the kitchen area, and Goldstein turns his body towards her and is yelling something at her.

82. Allard grabs Goldstein's arm and Goldstein turns back toward Allard.

83. Allard pushes Goldstein to the ground, placing his left hand on Goldstein's left arm, and his right hand behind Goldstein's head, forcing Goldstein to lie on his belly. Bechtold is seen moving toward Goldstein, moving past the white male with the white hat, later identified as Alexander Leone ("Leone").

84. While Goldstein is laying on the ground, a young lady, later identified as Madison Wahler ("Wahler"), squats down beside Goldstein and asks Allard something indiscernible.

85. It appears a crowd of people are watching this happen to Goldstein and protesting.

86. Bechtold is seen on the other side of Goldstein holding him down.

87. There is a male wearing a white sports jersey standing near to Goldstein his arms outspread.

88. Allard is heard yelling "Get back," and the man in the white jersey, his arms still outspread backs away.

89. Bechtold pulls out a taser and turns to face the crowd behind him brandishing the taser.

90. The man in the white jersey starts gesturing for other people to leave and is seen cupping his hands around his mouth to yell, but what he yells is indiscernible.

91. The young woman is seen again crouching down by Goldstein's head, and is heard saying, upon information and belief, "I'm not going to leave, I'm not going to leave. You… [inaudible].  In the fucking face.  Are you kidding me?"

92. Allard yells "Leave," and the woman says no.

93. Allard then pushes her and she falls backward onto the floor.

94. The woman yells. "Stop. Stop."

**EXCESSIVE FORCE**

95. Allard yells something inaudible and Goldstein turns to look over his shoulder, still in a prostrate position, and yells something inaudible to Allard.

96. A young woman is, handcuffed, on the ground next to Goldstein, lying prostrate on her belly.  Bechtold is seen kneeling on her back.

97. The picture becomes very shaky as Allard appears to turn Goldstein over to spray him in the face.

98. Goldstein rolls over onto his back, or is rolled over onto his back.  It is unclear from the body cam whether Goldstein rolls over on his own volition, or whether Allard rolls Goldstein over forcibly.

99. Allard grabs Goldstein with his left hand, holding it against Goldstein's face and neck.

100.     Allard is then seen pepper spraying Goldstein in the eyes and face.

101.     Allard's hand is approximately six to eight inches away from Goldstein's face, and the burst of pepper spray lasts approximately two seconds.



102.     As Allard pepper sprays Goldstein, Bechtold jerks his head away. Apparently, some of the pepper spray got in Bechtold's face and eyes.

103.     Bechtold gets up, releasing the young woman he had been restraining, still holding his taser, and pressing his left hand against his eyes.

104.     The young woman is still on the ground, apparently in distress, and the male in the while jersey and Leone come over her to comfort her.

105.     Other party goers are seen watching these events.  One young woman comes over with a camera apparently taking pictures of Allard and Goldstein.

106.     Allard starts yelling for them to "Get back," and "You are under arrest if you do not get back."

107.     Bechtold is seen moving toward the group of party goers who are standing watching these events.

108.     Bechtold places his right hand on the chest of Leone, and Leone brushes his hand away.

109.     It is unclear from the camera angle what happens, but it appears Leone is pushed backwards by Bechtold, and a couple of other men move in to keep Leone away from Bechtold.

110.     Allard is heard yelling "He's under arrest.  That guy is under arrest."

111.     Bechtold is seen moving in the direction where Leone went, farther into the residence.

112.     It appears another police officer has arrived.

113.     Leone is seen moving in the background and Bechtold moves toward him and he, along with two or three officers who now appear on video to restrain him and throw him to the ground.

114.     As Allard's camera pans, Wahler, the young woman Allard had pushed is seen on her knees being cuffed behind her back.

115.     Goldstein is heard yelling "Wipe it out of my eyes," or words to that effect.

116.     Several people remain, and Bechtold is seen standing next to one still rubbing his eyes in apparent discomfort.

117.     Goldstein is heard yelling again "Wipe it off, please."

118.     Another officer is seen speaking to Bechtold, who is still rubbing his eyes in apparent discomfort.

119.     Goldstein is brought to his feet, and he is seen squinting his eyes.

120.     A woman is heard yelling to the officers saying "You guys are fucking assholes."

121.     As Goldstein is led down the hallway, it appears his eyes are still closed, and he says "I can't see."

122.     As the officers exit with Goldstein, a man and a woman, are seen entering the house, and someone, possibly Allard, says to them "Guys, we need to leave."

123.     The male, responds "Her coat is inside."

124.     Goldstein, is heard saying "Officer, I'm begging you, please…" The rest is indiscernible.

125.     The officers lead Goldstein down the stairs, and Goldstein can be heard moaning in pain.

126.     Goldstein is heard, "Officer, I'm begging you, please wipe this out of my eyes."

127.     The officer, who is not identified, responds "You'll be alright.  I got some in mine too."  This latter statement, suggests it is Bechtold speaking.

128.     Goldstein says again, "Please, I'm begging you.  Please wipe it off of my face.  Please.  Officer, please.  Just wipe it off of my face.  Please.  It keeps seeping into my eyes."

129.     A young female is heard yelling "…. Fucking, fuck you."

130.     Goldstein says, "Don't listen to them."

131.     The officer, possibly Allard, says "Excuse me?" to the woman who spoke.

132.     Goldstein says, "Please wipe it off my eyes."

133.     The officer, possibly Allard, says to the woman "Do you want to be arrested as well? I suggest you leave."

134.     Goldstein continues, "Officers, please just wipe this off of my eyes. Please.  Anything.  Just wipe it off my eyes."

135.     A young woman is heard yelling "You guys are the most fucked up people ever."

136.     The officers bring Goldstein to a cruiser and place him against the rear of it to be searched.

137.     Bechtold comes into view, next to Goldstein, blinking his eyes and shaking his hands.

138.     Upon information and belief, Allard says to Bechtold, laughing "You were like… [indiscernible] feet from me.  I don't know how you got it."

139.     Allard asks Goldstein whether he has anything illegal on him, and Goldstein responds "No."

140.     Allard frisks Goldstein, but finds nothing illegal on him.

141.     Allard asks Goldstein "Do you have any ID on you whatsoever?" Goldstein says "No."

142.     Allard asks Goldstein "Do you have anything in the house that is your property?"  Goldstein says "No."

143.     Goldstein asks "Can I spit," and Allard says "Go ahead."  Goldstein spits on the ground.

144.     Goldstein asks "Can I please beg one of you to wash some of this out of my eyes?"

145.     Allard says "I don't have anything to wipe it with.  What we're going to do is we're going to have a seat and I'm going to get your information."

146.     Goldstein asks "Can I wipe my shirt against my eyes?"  Allard says "Sure."

147.      Goldstein, who is still handcuffed behind his back, bends and twists to bring the shirt to his eye.  Goldstein then says, groaning in pain, "Oh, it burns more." Allard says "Yep.  Alright.  C'mon let's have a seat bud."

148.      Allard brings Goldstein around to the passenger side of the cruiser. Bechtold comes back into view, still rubbing his eye.

149.      Goldstein says, "Oh, it stings so bad boys."

150.      Someone is heard yelling in the background "How many times did I tell you to get back?"

151.      Allard opens the rear passenger seat and says to Goldstein "Have a seat in there."  Goldstein gets into the cruiser.  Goldstein's eyes are still closed, and he appears to be in great pain.

152.      Allard asks pedigree information of Goldstein.  Allard asks Goldstein for his local address and Goldstein tells him it is 702 Hudson Street.  Allard says "So you do live here."  Goldstein answers "Yes, I do."

153.      Allard then says "Okay.  So that's why you're under arrest, because you weren't cooperating when you said you lived here.  Okay?"

154.      Goldstein asks again, "Can I get something to wipe my face off?"

155.      Allard says "When we get downtown we actually have a sprayer that goes right in your eyes.  It's the best thing for you."

156.      Goldstein asks, groaning in pain, "Oh, can I get that now?"

157.     Allard responds "Soon as we get down there."  Goldstein asks "Can we go now?"  Allard says "Yes."

158.     Allard closes the cruiser door and turns to his left, his camera panning over.  Leone is seen sitting on the curb of the street, next to two standing officers, one of whom is Bechtold.

159.     But they do not leave right away, instead the camera continues.

160.     It is unclear who Allard is speaking to, and it is unclear if he is speaking about Leone or Goldstein, but he says "So this is the resident.  He wasn't being very cooperative in there.  So he got arrested… [indiscernible].  He got arrested as I said… [indiscernible].  …His girlfriend.  There's another female too that came up and interfered and had to get pushed away.  She was taken down.  Dan had her down.  I don't know where she went to…"  Another officer asks "Blond hair?"  Allard says, "No, she had dark hair…"  The officer responds, but his voice is too low to make out what he is saying.

161.     Leone says "You guys like took her down earlier, and like she was crying on the floor is what happened.  And then, I mean, she might…"  The rest of what he says is unclear, as Allard is heard saying, "Hey, Dan?  What happened to that girl that you had down next to him?"

162.     Bechtold comes close to Allard, and someone says "I don't know."

163.     The camera pans back to Leone. People who are out of the camera's scope are apparently saying things to him.  At one point, Leone says "I can't talk shit right now, I've got handcuffs on me."

164.     Someone yells "Keep your mouth shut.  Stay quiet," but it is unclear whether an officer says that, or one of the people off camera.

165.     Leone responds, saying… "Yo, he was pointing a taser at me.  He says I was coming at him.  I'm not going to walk at someone pointing a taser at me."

166.     Allard points to Leone and says "If we have a car, yeah, we can put him in.  He's going to be an obstruction, and then a resisting probably I'd imagine."

167.     Leone is being led away as Allard says this, and Leone turns to Allard and says "A resisting? I wasn't resisting shit."

168.     Someone yells "Quiet, Leone."

169.     Allard asks Bechtold, who is seen walking past him, "You alright, Dan?" Bechtold responds "Yep."

170.     Bechtold is seen walking to his car, opening his driver's side door, pulling a plastic bottle of water out, then closing the door and walking towards Allard.

171.     Allard asks Bechtold "Are you red?"  Bechtold says "Yep," and Allard says "I'll go green."

172.     At that point the recording ends.

173.     The time of the arrest is noted on the initial accusatory instruments as 23:45 hrs, including a NYS CPL 710.30-1a notice; a noticeable inconsistency is found on the appearance ticket for a noise violation, which states the time of offense being "2330."

174.     An amended accusatory instrument alleged resisting arrest at 23:19.

175.     Allard's body camera begins again at the police station where the clock on the wall reads 01:15.

176.     Allard's video begins as he is being asked by his superior officer whether "he was handcuffed before." Allard says: "yes, handcuffed before", and points into a holding room, saying: "yes him", referring to Goldstein.

177.     The rest of that video shows Allard interviewing Leone, who is handcuffed to the bench.

178.     The video shows the same clock on the wall, and approximately 10 minutes has elapsed at this point.

179.     Allard takes Goldstein into the back of the station so that Goldstein can use the restroom in a cell. He is not handcuffed.

180.     Goldstein is printed. Approximately twenty-four minutes into this video Goldstein is allowed to rinse his eyes again. He is clearly in pain and distress, nearly two hours after he was pepper sprayed in the eye by Allard while handcuffed on the floor.

181.     Bechtold also recorded the entire incident.

182.     The recording was delivered by the prosecutor in connection with discovery in the underlying criminal case against Goldstein on a CD.  The particular file containing the footage is labeled "AXON_Body_Video_2016-11-17_2334."  **Exhibit 2.**[2]

**BECHTOLD BODY CAM VIDEO**

183.     When Bechtold first approaches Goldstein he asks Goldstein "Alright, buddy you live here?" Goldstein responds "Yes, I do."

184.     Bechtold asks Goldstein "Oh you do live here?  You got any ID on you please?"  Goldstein responds "I do not."

185.     Goldstein is lingering in the vicinity of Bechtold as a small crowd passes to exit.

186.     Bechtold walks over to Allard.   Allard asks Bechtold "Was that a resident?" and Bechtold points with his flashlight in the general direction Goldstein went, "Yeah, with the orange…"  and Bechtold walks farther into the residence where Goldstein went.

**ILLEGAL DETENTION**

187.     Bechtold goes over to Goldstein, who has moved about three feet, and tells him "I need you to come back over here."  It appears Bechtold grabs Goldstein's

---

[2] The DVD containing the footage of Defendant Bechtold's body cam was sent to the Clerk of the United States District Court for the Northern District of New York for filing.

right arm and pulls Goldstein toward him, stands him against a wall and tells him to "stay right here please."

188.	Numerous people are seen leaving.

189.	Bechtold turns and Goldstein can be seen being pulled back towards Bechthold.

190.	Bechtold brandishes his flashlight in Goldstein's face and yells "Stay here. Do not leave."   Goldstein asks "For what reason?", and Bechtold responds "I'm not going to tell you again."   Goldstein repeatedly asks "Am I being detained?   Are you detaining me?"   Bechtold says "You are being detained," and Goldstein asks "For what reason?   What reason am I being detained?"   Bechtold answers "I told you not to move."   Goldstein still asks repeatedly "For what reason am I being detained?  Why am I being detained?"

191.	By this time, Allard has come up behind Goldstein and has grabbed one of Goldstein's arms, placing it and holding it behind his back.  Goldstein is handcuffed.

192.	Allard is yelling "Get these people out," or words to that effect.

193.	Leone comes up and says something to Goldstein.   Goldstein yells "Leone" several times, and shakes his head.

194.	Bechtold approaches the crowd farther back in the residence, standing in the living room area, yelling "Leave, leave…"

195.	At this time Julia Judge is thrown on the floor by Bechtold.

196.     Bechtold's camera becomes obscured, blocking what is, based on Allard's body cam, the moment Goldstein is thrown to the floor by Allard.

197.     Bechtold is yelling to "Get back, get back," and the images partially show some other people backing away, and one of them appears to be arguing.

198.     Bechtold's body cam pans over, and Allard is seen straddling and restraining Golstein.  Allard reaches behind him and pulls a small canister from his belt and begins shaking it.

199.     Allard yells, "Get back now, or you're getting sprayed."  Someone keeps yelling "Get back, get back" and the crowd of students is seen backing away.

200.     One of the officers is heard yelling, "If you don't live here, leave."

201.     A man wearing a white jersey starts instructing the students to leave.

202.     Bechtold is seen with a taser in his hand, and that he is brandishing it to the other people, particularly the man in the white jersey.

203.     The man in the white jersey reaches down and across to comfort Wahler, the young woman who is seen pushed by Allard in Allard's body cam.

204.     Goldstein is heard screaming in pain, upon information and belief, in response to being pepper sprayed by Allard.

205.     Bechtold's camera catches Leone and another man comforting Judge who had been thrown to the ground by Bechtold, but who is now lying on the floor.

206.    Allard can be seen pointing up, and a young woman is screaming at him, although her words are unclear.

207.    Bechtold appears to be standing and his body camera captures a number of people standing around watching these events unfold.  Several young men appear to be arguing with the officers, but none are displaying aggressive behaviors, making threats, or yelling.

208.    Someone, possibly Bechtold, is repeatedly yelling "Get back.  Stay back."

209.    Bechtold's body camera becomes very erratic, but it appears that he and other police officers have restrained Leone, forcing him to the ground with his hands behind his back.

210.    Goldstein is seen being led out of the residence.  A young woman is yelling in the background, but her words are not clear.

211.    Goldstein can be seen wincing in pain, and he can be heard saying the same things already described above, and captured on Allard's body camera.

212.    Goldstein is led outside and to one of the cruisers.  Bechtold's camera captures Goldstein wincing in severe pain before being placed into the cruiser.

213.    Bechtold then turns to Leone, and asks Leone "How many times did I tell you to get back?  How many times?"  Leone responds "I was back."  Bechtold says "No, you weren't," Leone says "Yes I was," and Bechtold says "No, you weren't." Leone says "I was back.  You literally just kept saying 'Get back, get back, get back.'  I was going

back.   …[inaudible].   I don't why you had to come in and tackle me."   Bechtold responds, "Good thing it's all on camera, so that'll be good."

214.     Bechtold can be heard sighing and moaning, and sniffling in apparent discomfort for having been pepper sprayed.  He walks away from the cruisers, and down the road, then back again.

215.     Bechtold can be heard saying "I have some water," apparently to himself.

216.     Notably, Goldstein is not offered any water at this time.

217.     Bechtold goes to the cruiser, opens the door, and pulls out a water bottle, and walks down the road again, away from the cruisers.  Bechtold can be seen using the water in the water bottle to clean out his eyes.  He can be heard, sniffling, and sighing.

218.     Leone can be seen placed into the squad car.  Bechtold walks around to the front of the vehicle, and Allard can be heard asking Bechtold "You alright, Dan?"

219.     Bechtold asks Allard "Are you red?", at which point the tape ends.

220.     Goldstein was charged by two separate informations: the first contained charges for Obstruction of Governmental Administration ("OGA") and Resisting Arrest, the second Amended Information charged him with Resisting Arrest only.

221.     The original Information for Resisting Arrest, dated November 19, 2016, states that Goldstein was being arrested for OGA alleging that he had pulled his arm away numerous times as he was going to be cited for a local noise ordinance as they believed he was a resident at the house party, and that this behavior prevented the

officers from clearing out the house.   **Exhibit 3.**

222.     The People refused to state ready on said charge because it was facially insufficient.

223.     The Police filed an amended information on the charge of Resisting Arrest, presumably acknowledging that there were no grounds to arrest Goldstein for OGA; the People acknowledged the facial insufficiency of the original OGA information at arraignment.   **Exhibit 4.**

224.     Allard changed the sworn to facts in an attempt to tailor the facts in the amended information to make a viable charge where none existed.  Specifically, Allard changed the language from Goldstein was going to be cited for a noise violation, to Goldstein was going to be arrested for resisting arrest.  The time of the arrest and alleged violations changed as well. The amended information claimed that the charge of Resisting Arrest arose out of Goldstein's attempt to avoid being arrested for a local noise ordinance. But in the supplemental report, Allard states that "I then walked over to and PO Bechtold assisted me in placing Mr. Goldstein under arrest for obstructing this investigation."   Bechtold states "[a]t this point PO ALLARD and I placed GOLDSTEIN in handcuffs and told him he was being detained until the situation could be resolved."

225.     Most importantly, Goldstein was never told he was being arrested, he complied with every command that either officer made, and he posed no threat to the

arresting officers.

226.     Moreover, Goldstein was handcuffed when he was thrown to the ground because someone else, Judge, was allegedly interfering with his detention.

227.     No facts are alleged that explain why Goldstein was thrown to the ground before he was pepper sprayed.

228.      There is no body camera evidence of non-compliant behavior by Goldstein between the time he is handcuffed and the time he was thrown to the ground.

229.     There is no body camera evidence that shows Goldstein actively resisting arrest or attempting to injure Allard while on the ground.

230.     Goldstein was handcuffed and prostrate when he was pepper sprayed. There is no justification for the unreasonable and gratuitous use of pepper spray against Goldstein.

231.     There are no alleged facts that explain why Goldstein had to be handcuffed and then thrown on the ground.  And the purported reason to pepper spray Goldstein does not comport with the video evidence.

232.     The vast majority of this incident was captured by the officer's body cameras, as well as by several bystander's cell phone videos.

**OFFICERS' STATEMENTS CONTRADICTED BY VIDEO EVIDENCE**

233.     There are specific statements in Allard's Supplemental Report that are directly contradicted by the video evidence.

234.    For example, Allard states:  "I could hear the noise from approximately 1 city block in either direction, clearly in violation of local law."

235.    There is no video evidence Allard was standing at any time at a distance of one city block (whatever that distance actually is) in any direction from 702 Hudson Street, Ithaca, to be able to make this statement definitively.

236.    Allard states: "We walked onto the porch landing area and the door to the apartment was open with a DJ projecting music, beer chugging, a keg being served and over 100 people (mostly appearing to be under 21 years of age) being very loud and having a party which did not appear to be in control."

237.    There is no video evidence showing a DJ, showing anyone chugging beer, showing a keg, nor does the video evidence show 100 people Allard somehow knows appear under the age of 21 years, or that the party was out of control.

238.    In fact, the video evidence clearly shows that people leaving the party as the officers approached were very polite and respectful to the officers, responding to the officers wishes that they have a safe night with "You too," and "Thank you," and the like.  Obviously, the party was not out of control.  The only thing out of control at this party were the officers who illegally entered the residence without a warrant, with no exigent circumstances, and who illegally detained and arrested Goldstein, prompting many of the party-goers to protest their actions.

239.    Allard states: "I yelled to the people in the doorway, asking for a resident

and they turned away from me, retreating inside."

240.     The video evidence contradicts this statement, because, as shown on the video, a single female is standing in or about the doorway when the officers approach. Allard yells "Okay guys, who lives here?", and the female responds "I don't know."  At which point, Allard and Bechtold illegally enter the residence and start yelling "Everybody out," and words to that effect.

241.     Allard and Bechtold only asked one person "who lives here?" before entering the residence, not "people in the doorway," and the person responded "I don't know."  They did not wait, or ask anyone else if they know who lives at the residence. They did not ask anyone to get a resident to come to the front door to speak to them.

242.     Allard states: "It was clear that I needed to get the attention of the party goers to get the party to settle down/clear out so I could address residents.  We entered to shut the party down and address the residents."

243.     These stated facts demonstrate Allard's and Bechtold's entry into the residence was illegal, under no warrant, and under no exigent circumstances.

244.     Allard states: "At this time, I looked over and saw PO Bechtold struggling with Mr. Goldstein.  It appeared that Mr. Goldstein had been ordered numerous times by PO Bechtold to stay with PO Bechtold and that he not complying."

245.     The video evidence shows no struggle.  There is no video evidence that supports the contention Allard makes that "[i]t appeared that Mr. Goldstein had been

ordered numerous times by PO Bechtold to stay with PO Bechtold and that he was not complying."

246.     In fact, the video evidence demonstrates there was no way for Allard to have known, one way or the other, whether Bechtold had ordered Goldstein to stay with him, much less whether Goldstein was complying.

247.     Allard states that Goldstein was "adamant now that he was not a resident and that the police could not detain him.  I asked him if he told PO Bechtold that he was a residence and he stated he did not."

248.     In fact, Bechtold's body cam shows that Goldstein clearly told Bechtold Goldstein lived there, and the likely reason for Allard's confusion on this point was his failure to ask Bechtold what Goldstein told him.

249.     Allard states: "It was also clear that Mr. Goldstein was highly intoxicated via alcohol."

250.     The video evidence does not show whether Goldstein was intoxicated or not, or whether, if he was, it was secondary to alcohol.  Goldstein is standing, without swaying, he is speaking without slurring his words, nor does he seem to be confused at all, or even unusually aggressive.  He is obviously, and with good reason, irate that the officers had illegally entered his residence, and were detaining him as evidenced by him questioning whether he was detained, and if he was detained, for what.

251.     Allard states:  "I then had to place my attention back to Mr. Goldstein who

was struggling more aggressively, putting his whole body weight into pulling away from me.   Mr. Goldstein was also yelling at party goers in the bathroom to intervene with my arrest of his person."

252.     Again, the video evidence contradicts this statement.   At one point, Goldstein is yelling to a young woman, possibly Judge, possibly Wahler.   As the young woman steps back into a kitchen area, Goldstein leans forward to continue to speak to her.   His actions are clearly directed at communicating with the young woman, not "struggling more aggressively, putting his whole body weight into pulling away from" Allard.   Further, Goldstein is apparently yelling to her to get a video camera, presumably to film his illegal arrest, but Goldstein in no way asked, goaded, or requested anyone intervene with Allard's arrest of him.

253.     Allard states: "Other people were running over to attempt to assist Mr. Goldstein in getting away from me, and I had to pull him off the wall so I could keep an eye on PO Bechtold's back.   In response, Mr. Goldstein pulled away from me again, and I used a hip toss technique to place him on the floor of the residence…"

254.     This is clearly false, as the video evidence shows no people running over to attempt to assist Goldstein get away from Allard, and because Allard threw Goldstein to the ground immediately after he had leaned forward to continue talking to the young woman who was backing into the kitchen area.

255.     Allard continues in his report:  "Subjects were continuing to surround and

attempt to interfere with PO Bechtold and I by reaching to the subject in our control and attempting to place their bodies in our way to shield Mr. Goldstein."

256.     Again, this is a false statement when compared against the actual video evidence which shows no one attempting to place their bodies in Allard's or Bechtold's way to shield Goldstein.  That statement is pure fiction.

257.     Allard continues with his dramatic and fictional account:  "One [white female], later identified as Madison Wahler, got down on her knees, grabbing the head of Mr. Goldstein, effectively using her body to shield him from me."

258.     This statement is untrue, because the video evidence shows that while Wahler was down on the ground holding or near to Goldstein's head, she was on the opposite side of Allard, and her body was not effectively, or ineffectively, or even with any reasonable interpretation, in any way using her body to shield Goldstein from Allard.

259.     In fact, it appears Wahler is asking Allard why he pushed Goldstein to the ground, but the audio is unclear.

260.     At the point in time Wahler kneels down to Goldstein, Goldstein is handcuffed behind his back, he is lying prostrate on his belly on the floor, and Allard is on top of them.  Allard's body cam clearly shows Wahler in front of him, and not in between him and Goldstein.

261.     Allard continues "…after I pushed Ms. Wahler this time, Mr. Goldstein

35

began to physically resist, moving his body out from underneath me and threatening to injure me.  I had to push Mr. Goldstein down by his head, however he continued to maneuver his body out from underneath me and push his head into my body, near my groin area.  It appeared to me that he was trying to either headbutt me or bite me and he was acting very irrational."

262.     Once again, the video evidence belies this fantastic narrative.  It is clear and undisputed from the video evidence that Allard pushed Wahler away and she fell on her butt yelling "Stop, stop."  Goldstein, who is on the floor, on his belly, with his handcuffs behind his back, and Allard on top of him, twists around and yells at Allard over his shoulder.  There is no video evidence whatsoever that shows Goldstein trying to maneuver his body out from underneath him, or push his head into Allard's body, or groin area.  There is nothing in the video that could even be construed as showing Goldstein trying to headbutt or bite Allard.

263.     Allard writes he "had to gain full compliance from Mr. Goldstein, or risk injury to myself from others coming towards me.  I did then deploy a 1-2 second burst of pepper spray to the face of Mr. Goldstein, which was immediately effective in calming him down and stopping his aggressive resistant behavior."

264.     The video clearly shows that in the seconds before Allard pepper sprayed Goldstein, no one was coming towards him.

265.     Allard then writes:  "I also saw Mr. Leone move up and push PO Bechtold

towards me with both hands."

266.     There is no video evidence to support this from either Allard's or Bechtold's body cam, and it appears that it was Bechtold that pushed Leone away.

267.     Allard write: "PO Bechtold was not able to keep custody of Ms. Judge and she fled from the area."

268.     Allard conveniently leaves out the fact that when he pepper sprayed Goldstein, some of the pepper spray got into Bechtold's eyes.  The video evidence clearly shows Bechtold releasing his grip on Judge, standing, and walking away from her prone body, rubbing his eyes.

269.     Two young men, one of them Leone, approach Judge who is still on the floor to comfort her, and it appears one of the them, the male in the white jersey, picks her up to take her into the kitchen.

270.     There is no video evidence Judge fled the scene.

271.     Allard writes "It should be further noted that I was able to see Mr. Leone attempting to intervene during the entire call from the time Mr. Goldstein was placed into handcuffs, making it clear he was lying about his involvement."

272.     The only thing the video makes clear is that Allard is lying about Leone's involvement "during the entire call" since the video does not show Leone attempting to intervene, but rather resisting Bechtold's illegal assault of him.

273.     Bechtold's Supplemental Report contains several similar distortions of the

facts like Allard's.

274.     Bechtold writes "A few very intoxicated people walked out of the upstairs door and down the stairs in our direction."

275.     The video shows people leaving, but nothing in their behavior gives any indication that they are "very intoxicated," and, in fact, by the way they respond to the officers' greetings they do not appear "very intoxicated."

276.     Bechtold writes:  "We walked up the stairs and found the door to the residence wide open.  There was a female standing near the doorway, just inside the house.  PO ALLARD asked the female if she lived there and she turned and walked back into the home without answering."

277.     The video evidence shows this statement is false, as the video evidence clearly shows the woman answering "I don't know" to Allard's question.

278.     Of note, Bechtold's report indicates that Goldstein told Bechtold he was a resident.

**INJURIES TO GOLDSTEIN**

279.      On November 19, 2016 Goldstein sought emergency medical attention and was diagnosed with Chemical conjunctivitis in both eyes, and Scleral abrasion in the left eye, Goldstein was referred to an ophthalmologist.

280.      On November 22, 2016, Goldstein was treated for a 2-day follow up to injury, and was diagnosed with severe abrasion/chemosis with almost complete

epithelial loss. A Prokera lens was inserted due to a non-healing corneal abrasion and epithelial loss. Goldstein's eye was noted to be quite painful and blurry.

281.     During that follow up visit it was further noted that Goldstein's limbal stem cells were 75% destroyed.  To treat this serious injury, an amniotic membrane graft was attempted.

282.     On November 28, 2016 Goldstein went for 5-day follow-up. He could not see out of the Prokera lens, and his eyes were very light sensitive. Although the lens was scheduled to be removed at this visit, the Physician found that it needed more time to heal.

283.     The lens were removed on December 2, 2016 and the eye was bandaged for three days.

284.     On December 5, 2016 the bandage was removed, but light sensitive, blurry vision persisted and there was chronic tearing in the left eye.

285.     Goldstein is a student at Ithaca College and this injury occurred during his final exam period, which adversely affected his academic performance because he was unable to see well. This violation of his civil rights has left him with permanent damage to his vision, and pain and suffering.

286.     Allard acted maliciously and wantonly, with the intent to injure Goldstein, in committing the acts described in this complaint, warranting the imposition of punitive damages.

287.     On January 9, 2017, after reviewing all relevant video and reports, upon application of the Tompkins County District Attorney, and with the consent of Goldstein and his Attorney, John A. Fitzgerald Esq., all charges related to this incident against Goldstein were Ordered Dismissed with prejudice by the Ithaca City Court. **Exhibit 5.**

## COUNT ONE
## GOLDSTEIN v. ALLARD
## 42 U.S.C. § 1983 – EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

288.     All of the allegations of the complaint are incorporated.

289.     42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

290.     Goldstein is a citizen of the United States and Allard is a "person" for purposes of 42 U.S.C. § 1983.

291.      Allard, at all times relevant, was acting under the color of state law in his capacity as an Ithaca City Police Officer and his accts or omissions were conduct within the scope of his official duties or employment.

292.     Goldstein has a clearly established right under the Fourth Amendment to be secure in his person from unreasonably seizure through excessive force.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).

293.     Goldstein also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

294.     Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

295.     A police officer's application of force is excessive in violation of the Fourth Amendment, "if it is objectively unreasonable `in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Graham*, 490 U.S. 386, 397 (1989)).

296.     More specifically, "[d]etermining whether the force used to effect a particular seizure is `reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted).

297.     Allard's actions and use of force, as described in this Complaint, were objectively unreasonable in light of the facts and circumstances confronting him and violated Goldstein's Fourth Amendment rights.

298.     Allard's actions and use of force, as described in this Complaint, were also malicious and/or involved reckless, callous, and deliberate indifference to Goldstein's federally protected rights.  The force used by Allard shocks the conscience and violated Goldstein's Fourteenth Amendment rights.

299.     Allard unlawfully seized Goldstein by means of objectively unreasonable, excessive and conscious-shocking physical force, thereby unreasonably restraining Goldstein of his freedom.

300.     Allard's use of physical force against Goldstein was objectively unreasonably gratuitous, and excessive in light of the facts and circumstances confronting Allard in that:

i.     Goldstein had a legitimate reason to inquire whether he was being detained and whether he was free to leave;

ii.     Allard assigned his fear of the crowd's reaction to his violence against Goldstein as an excuse to further injure Goldstein;

iii.     Goldstein never engaged in criminal behavior in the presence of Allard;

iv.     Allard exacerbated the facts and circumstances by throwing Goldstein on the ground when he was handcuffed, and then pepper spraying him directly in the eyes when the remaining attendees expressed concern;

v.     Allard assigned the criminal behavior of others to Goldstein in an attempt to collectively punish the disbelieving onlookers;

vi.    Allard had no authority to arrest Goldstein;

vii.   Allard had no authority to throw Goldstein onto the ground while handcuffed;

viii.  Allard exacerbated the facts and circumstances by grabbing Goldstein's arm and tossing him onto the ground, without

ix.    Goldstein made no attempt to flee; and

x.     Allard illegally pepper sprayed Goldstein while he was handcuffed and not resisting arrest or detention with the intent and for the purpose of summarily punishing Goldstein.

301.    The force used caused serious and permanent bodily injury to Goldstein.

302.    Allard engaged in the conduct described in this Complaint willfully, maliciously, in bad-faith, and in reckless disregard of Goldstein's federally protected constitutional rights.

303.    Allard did so with shocking and willful indifference to Goldstein's rights and with conscious awareness that he would cause Goldstein severe physical and emotional injuries.

304.    The acts or omissions of Allard were moving forces behind Goldstein's injuries.

305.    The acts of omissions of Allard, as described in this Complaint, intentionally deprived Goldstein of his constitutional rights and caused him other damages.

306.     Allard is not entitled to qualified immunity for the complained of conduct.

307.     Allard, at all times relevant, was acting pursuant to municipal custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in his actions pertaining to Goldstein.

308.     As a proximate result of Allard's unlawful conduct, Goldstein has suffered actual physical and emotional injuries, and other damages and losses as described in this Complaint entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of Allard's unlawful conduct, Goldstein has incurred special damages, including medical related expenses and may continue to incur further medical and other special damages, in amounts to be established at trial.

309.     Upon information and belief, Goldstein may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of the injuries to his eyes, in amounts to be ascertained at trial.  Goldstein is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.  There may also be special damages for lien interests.

310.     Upon information and belief, Allard will continue in his unlawful conduct, unless and until restrained by this court.  If Allard is not restrained as specified below, Goldstein will suffer immediate and irreparable injury, loss, and

damage in that Goldstein will continue to suffer from the fear of additional unlawful excessive force, and will continue to suffer humiliation and indignity, as well as great physical and mental pain and suffering resulting from Allard's ongoing deprivation of his rights.  Therefore, Goldstein requests the following injunctive relief:  Permanently enjoin Allard from using, or deploying pepper spray in arresting or detaining suspects.

311.    In addition to compensatory, economic, consequential, and special damages, Goldstein is entitled to punitive damages against Allard under 42 U.S.C. § 1983, in that the actions of Allard were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Goldstein.

### COUNT TWO
### GOLDSTEIN v. CITY OF ITHACA, ALLARD and BECHTOLD
### 42 U.S.C. § 1983 – DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

312.    All of the allegations are incorporated.

313.    On November 17, 2016, the Ithaca City Police Department, by Allard and Bechtold, without a search warrant, without an arrest warrant, and without any further substantiating evidence, probable cause, or evidence that a crime was being committed, unlawfully entered and searched the home of Plaintiff, Goldstein.

314.    On November 17, 2016, Allard and Bechtold were not in possession of facts to give them exigent circumstances to allow them to enter and search Goldstein's residence.

315.     On November 17, 2016, Goldstein did not give, nor did any other resident at 702 Hudson Street, Ithaca, New York, give consent to Allard and Bechtold to enter and search the residence.

316.     Nevertheless, on November 17, 2016, Allard and Bechtold entered and searched Goldstein's residence at 702 Hudson Street, Ithaca, New York and detained, and arrested, and Allard used excessive force on Goldstein.

317.     Goldstein was charged with resisting arrest and obstruction of governmental administration, and both charges were dismissed.

318.     Goldstein's residence was entered and searched by Allard and Bechtold on November 17, 2016 without consent, without a warrant, without probable cause or exigent circumstances in violation of Goldstein's rights as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

319.     During the November 17, 2016 entry and search of Goldstein's residence by Allard and Bechtold, Goldstein was detained in violation of Goldstein's rights as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

320.     Allard and Bechtold failed to obtain a valid search warrant or arrest warrant before the detention and/or search of Goldstein's residence on November 17, 2016.

321.     Allard and Bechtold acted with malice, deliberate indifference for the constitutional rights of Goldstein, and acted with a conscious disregard for the

constitutional rights of Goldstein, resulting in injuries and damages to Goldstein as alleged in this Complaint.

322.    Under the Fourth Amendment of the United States Constitution and Article 1, § 12 of the New York Constitution, warrantless entries into an individual's home are presumptively unreasonable, subject to certain carefully circumscribed exceptions (*see United States v. Karo*, 468 U.S. 705, 717 (1984); *People v. McBride*, 14 NY3d 440, 445 (2010), *cert denied* 562 US 931 (2010); *People v. Molnar*, 98 NY2d 328, 331 (2002); *People v. Knapp*, 52 NY2d 689, 694 (1981)).   Under the New York Constitution, the emergency exception to the warrant requirement permits "the police [to] make a warrantless entry into a protected area if three prerequisites are met:  '(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.'"  (*People v. Gibson*, 117 AD3d 1317, 1318 (2014), *affd* 24 NY3d 1125 (2015), quoting *People v. Mitchell*, 39 NY2d 173, 177-78 (1976), *cert denied* 426 US 853 (1976); *see People v. Molnar*, 98 NY2d at 332.)  The Supreme Court of the United States has eliminated any consideration of subjective intent – i.e., the second prong of the New York test – from the emergency exception under the Fourth Amendment (*see Brigham City v. Stuart*, 547 US 398, 404-05 (2006)), and the Court of

Appeal has yet to address whether the second prong of the New York test remains viable in the wake of that Supreme Court determination (*see People v. Doll*, 21 NY3d 665, 671 n (2013), *cert denied* ___ US ___, 134 S Ct 1552 (2014); *People v. Dallas*, 8 NY3d 890, 891 (2007)).

323.     With respect to the three prongs of the emergency exception test:

a.  Under the first prong, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

   i.  There were no reasonable grounds here for the police to believe that there was an emergency as the police were responding to a noise complaint call.

b.  Under the second prong, the search must not be primarily motivated by intent to arrest and seize evidence.

   i.  Here, the search was primarily motivated by the intent to issue a citation or make an arrest for an alleged local law violation.

c.  Under the third prong, there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

   i.  Here, since there was no emergency, no reasonable basis existed to make such an association with the area or place to be searched.

324.     Accordingly, the City, Allard, and Bechtold, cannot justify the illegal search and seizure under the emergency exception to the warrant requirement.

325.     In being deprived of his personal freedom and liberty, the harm suffered by Goldstein was continuous in nature.  The acts and omissions of Allard and Bechtold, and each of them, were all part of Allard's and Bechtold's continuous acts of maliciously prosecuting and continuously prosecuting Goldstein for crimes which he did not commit.  The continuous deprivation of Goldstein's civil rights was manifested in numerous acts and omissions of Allard and Bechtold, and these unlawful, discriminatory and unconstitutional acts continued until such time as the charges against Goldstein were dismissed.

326.     Goldstein is informed and believes and alleges that Allard and Bechtold engaged in a scheme and a conspiracy to commit all of the acts and omissions alleged in this complaint, surrounding Goldstein's unconstitutional deprivations of liberty without due process of law, and to conceal, distort and obstruct the true facts of the incident to those who investigated the circumstances of Goldstein's unconstitutional detention and search, and Goldstein's subjection to excessive force by Allard.   In pursuit of this conspiracy, Allard and Bechtold made false statements, or distorted the truth, regarding their conduct and that of Goldstein's during this incident, and committed other overt acts in furtherance of this conspiracy.

327.     As a proximate result of the described acts, Goldstein was deprived of rights and immunities secured to him under the Constitution and laws of the United States including, but not limited to rights under the Fourth and Fourteenth Amendments to be secure in their person, to be free from punishment without due process and to equal protection of the laws. The search and seizure of Goldstein amounted to an arbitrary intrusion by Allard and Bechtold into the security of Goldstein's privacy and person, and were not authorized by law, and in that the contacts on Goldstein's person, and restrictions of his movements deprived Goldstein of liberty and property without due process of law.

328.     At all times mentioned in this Complaint, and prior, the City and the Ithaca City Police Department had a duty:

a.  To investigate the background and suitability of applicants to become police officers and to screen out applicants who have demonstrated a propensity to make illegal arrests and detentions, propensity to falsify evidence, and a propensity to withhold exculpatory evidence;

b.  To notify the Tompkins County District Attorney's Office of allegations of criminal misconduct by the Ithaca City Police Department;

c.  To impose disciplinary sanctions, including, where appropriate, reprimand, suspension, or firing of Ithaca City Police Officers found to have made illegal searches, detentions, and arrests, and who have falsified evidence;

d. To train Ithaca City Police Officers to respect and protect the federal constitutional and New York constitutional and statutory rights of citizens, homes, detainees, and arrestees;

e. To supervise Ithaca City Police Officers to assure that they do not make illegal detentions, searches, and arrests, falsify arrests, and withhold exculpatory evidence;

f. To supervise Ithaca City Police Officers to assure that they respect and protect the federal constitutional and New York constitutional and statutory rights of citizens, detainees, and arrestees;

g. Not to retain Ithaca City Police Officers who demonstrate a propensity to make illegal arrests and detentions, propensity to falsify evidence and a propensity to withhold exculpatory evidence; and

h. To refrain from making illegal arrests and detentions, falsification of evidence and to refrain from withholding exculpatory evidence.

329.    The City, Allard, and Bechtold, and each of them, negligently and carelessly breached the above described duties.

330.    As a proximate result of the foregoing, Goldstein suffered intense physical and emotional pain, anguish, distress, and despair, and was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

331.    As a direct and proximate result of the unlawful and malicious acts of Allard and Bechtold, all committed under color of their authority as Ithaca City Police

Officers, Goldstein suffered grievous bodily harm and deprivation of liberty, all of which is in violation of his rights under the laws and Constitution of the United States, in particular the Fourth and Fourteenth Amendments thereof, and 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988.

332.    Upon information and belief, after being employed and appointed as police officers for the City, and prior to commission of the acts complained of in this complaint, Allard and Bechtold, acting under the color of their authority as police officers, in the course and scope of their employment, committed similar acts and inflicted similar injuries and damages upon other persons without reasonable cause or justification.

333.    Upon information and belief, the City knew, or in the exercise of reasonable care, should have known of these prior acts and that Allard and/or Bechtold were unfit and prone to commit them but negligently failed to take stops to properly train, supervise, discipline and/or terminate Allard and/or Bechtold.

334.    In doing the acts and in failing and omitting to act, Allard and/or Bechtold acted with the implied and actual permission and consent of the City.

335.    As a proximate result of the negligence of the City, Goldstein was damaged and injured.

336.    The aforesaid neglect, failure, and refusal to instruct and train constituted execution of the patterns, practices, policies, and customs of the City.

337.     The aforesaid neglect, failure, and refusal to instruct and train, and promulgation and enforcement of policies, practices, and customs constituted an execution of the patterns, policies, practices, and customs of the City.

338.     As a direct and proximate result of the foregoing, Goldstein was deprived of his civil rights under the Fourth and Fourteenth Amendments of the United States Constitution.

339.     As a direct and proximate result of the foregoing, Goldstein has been harmed in that Goldstein was wrongfully incarcerated, searched, and detained, subjected to humiliation and indignity, and suffered great physical and emotional pain and suffering, all to his damage in an amount according to proof at trial.

340.     Upon information and belief, Allard and Bechtold, and each of them, will continue in their unlawful conduct, unless and until restrained by this court.  If Allard and Bechtold are not restrained, as specified below, Goldstein will suffer immediate and irreparable injury, loss, and damage in that Goldstein will continue to suffer from the fear of additional unlawful searches, seizures, illegal arrests, and will continue to suffer humiliation and indignity, as well as great physical and mental pain and suffering resulting from Allard's and Bechtold's ongoing deprivation of his rights. Therefore, Goldstein requests the following injunctive relief:  Permanently enjoin the City, and the Ithaca City Police Department, and their agents, employees, and

successors, and all persons in active conduct or participation with Allard and Bechtold, from engaging in unlawful searches, detentions, and arrests.

341.    The injury and damages suffered by Goldstein, and for which recovery is sought, includes general damages for injuries for emotional distress, and injuries to the body and loss of enjoyment of life in an amount in excess of $75,000.00; medical expenses and medical care and treatment for his injuries in an amount not yet fully ascertained; and loss of earnings and loss of capacity to earn a living in an amount not yet fully ascertained.

342.    The City, Allard, and Bechtold acted willfully, maliciously, intentionally, oppressively, and in reckless disregard of the possible consequences of their conduct and accordingly, Goldstein is entitled to and hereby demands punitive and exemplary damages in an amount to be proven at trial.

343.    Goldstein is entitled to and hereby demands costs, attorneys' fees, and expenses pursuant to 42 U.S.C. § 1988.

**COUNT THREE**
**GOLDSTEIN v. BECHTOLD**
**42 U.S.C. § 1983 – FAILURE TO INTERVENE**
**DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW IN VIOLATION**
**OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED**
**STATES CONSTITUTION**

344.    All of the allegations are incorporated.

345.    Bechtold knew or should have known, or deliberately ignored that Allard's entry into Goldstein's residence was a constitutional violation against

Goldstein, as Allard entered Goldstein's residence without a search warrant, without an arrest warrant, and without any further substantiating evidence, probable cause, or evidence that a crime was being committed, and in the absence of any exigent circumstances allowing Allard to enter Goldstein's residence.

346.     Bechtold had a reasonable opportunity to intervene and prevent the violation of Goldstein's constitutional rights by Allard, but failed to act.

347.     Bechtold failed to take any affirmative steps to intervene with Allard's violations of Goldstein's constitutional rights.

348.     Bechtold had an affirmative duty to intervene on behalf of Goldstein, whose constitutional rights were being violated in the presence of Bechtold.

349.     As a result of Bechtold's failure to intervene, Goldstein's constitutional rights were violated.

350.     As a result of the foregoing, Goldstein is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against Allard in an amount to be fixed by a jury, plus reasonable attorney's fees, costs, and disbursements of this action.

**COUNT FOUR**
**GOLDSTEIN v. BECHTOLD**
**42 U.S.C. § 1983 – FAILURE TO INTERVENE**
**EXCESSIVE FORCE**

351.     All of the allegations are incorporated.

352.      Bechtold knew or should have known, or deliberately ignored that Allard's use of paper spray against Goldstein was excessive force in violation of Goldstein's constitutional rights.

353.      Bechtold had a reasonable opportunity to intervene and prevent the violation of Goldstein's constitutional rights by Allard, but failed to act.

354.      Bechtold failed to take any affirmative steps to intervene with Allard's violations of Goldstein's constitutional rights.

355.      Bechtold had an affirmative duty to intervene on behalf of Goldstein, whose constitutional rights were being violated in the presence of Bechtold.

356.      As a result of Bechtold's failure to intervene, Goldstein's constitutional rights were violated.

357.      As a result of the foregoing, Goldstein is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against Allard in an amount to be fixed by a jury, plus reasonable attorney's fees, costs, and disbursements of this action.

**COUNT FIVE**
**GOLDSTEIN v. ALLARD and BECHTOLD**
**42 U.S.C. § 1983 – MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**

358.      All of the allegations of this Complaint are incorporated.

359.      42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

360. Goldstein is a citizen of the United States and Allard and Bechtold are each a "person" for purposes of 42 U.S.C. § 1983.

361. Allard and Bechtold, at all relevant times, were acting under color of state law in their capacity as Ithaca City Police Officers and their acts or omissions were conducted within the scope of their official duties or employment.

362. At the time of the complained of events, Goldstein had a clearly established constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment.

363. Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

364. Allard and Bechtold violated Goldstein's Fourth and Fourteenth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure false charges against him, resulting in his unlawful confinement and prosecution.

365.     Allard and Bechtold conspired or acted in concert to institute, procure and continue a criminal proceeding for OGA and Resisting Arrest against Goldstein without probable cause.

366.     Allard and Bechtold engaged in the conduct described in this Complaint willfully, maliciously, in bad-faith, and in reckless disregard of Goldstein's federally protected constitutional rights.

367.     The procurement of prosecution against Goldstein for the known to be false allegation of OGA and Resisting Arrest were malicious, shocking, and objectively unreasonably in light of the circumstances.

368.     Those criminal proceedings terminated in Goldstein's favor.   The prosecutor dropped the charges without any compromise by Goldstein, reflecting a prosecutorial judgment that the case could not have been proven beyond a reasonable doubt.

369.      The acts or omissions of Allard and Bechtold were moving forces behind Goldstein's injuries.

370.     Allard and Bechtold acted in concert and joint action with each other.

371.     The acts or omission of Allard and Bechtold as described herein intentionally deprived Goldstein of his constitutional and statutory rights and caused him other damages.

372.     Allard and Bechtold are not entitled to qualified immunity for the complained of conduct.

373.     Allard and Bechtold, at all times relevant, were acting pursuant to municipal custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in its actions pertaining to Goldstein.

374.     As a proximate result of Allard's and Bechtold's unlawful conduct, Goldstein has suffered actual physical and emotional injuries, and other damages and losses as described in this Complaint entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Allard's and Bechtold's unlawful conduct, Goldstein has incurred special damages, including medical related expenses and may continue to incur further medical or other special damages related expenses, in amounts to be established at trial.

375.     Upon information and belief, Goldstein may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of the injuries to his eyes, in amounts to be ascertained in trial.  Goldstein is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.  There may also be special damages for lien interests.

376.     In addition to compensatory, economic, consequential, and economic damages, Goldstein is entitled to punitive damages against Allard and Bechtold under 42 U.S.C. § 1983, in that the actions of Allard and Bechtold were taken maliciously,

willfully, or with a reckless or wanton disregard of the constitutional rights of Goldstein.

## COUNT SIX
### GOLDSTEIN v. CITY OF ITHACA and JOHN BARBER
### 42 U.S.C. § 1983 – DELIBERATELY INDIFFERENT POLICIES, PRACTICES, CUSTOMS, TRAINING, AND SUPERVISION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND IN VIOLATION OF 42 U.S.C. § 1981

377. All of the allegations of this Complaint are incorporated.

378. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

379. Goldstein is a citizen of the United States and Allard and Bechtold are each a "person" for purposes of 42 U.S.C. § 1983.

380. Defendant City and Barber at all relevant times were acting under color of state law.

381. Goldstein had the following clearly established rights at the time of the complained of conduct:

a. The right to be secure in his person and property from unreasonable search and seizure through excessive force under the Fourth Amendment;

b. The right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment;

c. The right to exercise his constitutional rights of free speech under the First Amendment without retaliation;

d. The right to be free from malicious prosecution under the Fourth and Fourteenth Amendments

382.    The City and Barber knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

383.    The acts or omissions of the City and Barber, as described in this Complaint, deprived Goldstein of his constitutional and statutory rights and caused him other damages.

384.    The acts or omissions of the City and Barber, as described in this Complaint, intentionally deprived Goldstein of his constitutional and statutory rights and caused him other damages.

385.    The City and Barber are not entitled to qualified immunity for the complained of conduct.

386.    The City and Barber were, at all relevant times, policy makers for the City and the Ithaca City Police Department, and in that capacity established policies, procedures, customs, and/or practices for the City and the Ithaca City Police Department.

387.     The City and Barber maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, including Goldstein, which were moving forces behind and proximately caused the violations of Goldstein's constitutional rights as set forth in this Complaint, and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

388.     The City and Barber have created an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Goldstein and of the public.

389.     In light of the duties and responsibilities of those police officers that participate in arrests and preparation of police reports on alleged crimes, the need for specialized training is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights, such as those described in this Complaint, that the failure to provide such specialized training and supervision evidences a deliberate indifference to those rights.

390.     The deliberately indifferent training and supervision provided by the City and Barber resulted from a conscious or deliberate choice to follow a course of action

from among various alternatives available to the City and Barber and were moving forces in the constitutional and federal violation injuries complained of by Goldstein.

391.     As a direct result of the City's and Barber's unlawful conduct, Goldstein has suffered actual physical and emotional injuries, and other damages and losses as described in this Complaint entitling him to compensatory and special damages, in amounts to be determined at trial.   As a further result of the City's and Barber's unlawful conduct, Goldstein has incurred special damages, including medical related expenses and may continue to incur further medical or other special damages related expenses, in amounts to be established at trial.

392.     Upon information and belief, Goldstein may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of the injuries to his eyes, in amounts to be ascertained in trial.   Goldstein is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.   There may also be special damages for lien interests.

393.     Goldstein also seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress the City's and Barber's above described ongoing deliberate indifference in policies, practices, habits, customs, usages, training, and supervision with respect to the rights described in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Kyle Goldstein, prays that this Court enter judgment for Plaintiff and against each of the Defendants and grant:

A. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B. Economic losses on all claims allowed by law;

C. Special damages in an amount to be determined at trial;

D. Punitive damages on all claims allowed by law against individual Defendant and in an amount to be determined at trial;

E. An injunction against Allard enjoining him from using, or deploying pepper spray in the detention or arrest of suspects;

F. A permanent injunction against the City, and the Ithaca City Police Department, and their agents, employees, and successors, and all persons in active conduct or participation with Allard and Bechtold, from engaging in unlawful searches, detentions, and arrests;

G. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H. Pre- and post-judgment interest at the lawful rate; and

I. Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

_____

Edward E. Kopko, Esq.
NDNY Bar Roll No. 510874
Edward E. Kopko, Lawyer, P.C.
Attorney for Plaintiff, Kyle Goldstein
308 N. Tioga St., 2nd Floor
Ithaca, NY 14850
T: 607.269.1301; F: 607.269.1301
ekopko@ithaca.law
Wednesday, October 10, 2018

_____

John A. Fitzgerald, Esq.
NDNY Bar Roll No. 303022
Attorney for Plaintiff, Kyle Goldstein
308 N. Tioga St.
Ithaca, NY 14850
T: 607.269.7125
jftizgerald@ithaca.law
Wednesday, October 10, 2018